IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE
HONORABLE ROBERT B. KUGLER

EMSL ANALYTICAL, INC.,                     :
                                           :
                Plaintiff(s),              :
                                           :
        v.                                 :        Civil No.  05-5259(RBK)
                                           :
TESTAMERICA ANALYTICAL TESTING             :
CORP., et al,                              :
                                           :
                Defendant(s).              :
_____

# O P I N I O N

Presently before the Court is Plaintiff EMSL Analytical, Inc.'s ("EMSL" or "Plaintiff") Motion for a Preliminary Injunction.  The motion seeks an injunction under Federal and State law to preclude the Defendants Testamerica Analytical Testing Corp., et al, ("Defendants") from infringing Plaintiff's marks.  For the reasons which follow, Plaintiff's application is **denied**.

## I. BACKGROUND

### A. Plaintiff

EMSL is a New Jersey corporation, established in 1981, which specializes in analytical and laboratory testing services including indoor air quality and related environmental testing work.  Although EMSL provides a wide array of testing services,[1] approximately 50% of

---

[1]   EMSL's range of services includes testing and analysis of drinking water, wastewater, groundwater, air, soil, paint, hazardous wastes, indoor air testing for silica and other toxins, as well as testing for asbestos, mold, bacteria, endotoxins, mycotoxins, mVOC's, allergens, industrial hygiene, lead, materials characterization, silica and environmental chemistry. (Pl. Mem. at 3.)

EMSL's current revenue comes from asbestos testing and related services.

EMSL is also a geographically diverse company.  Since the creation of its first laboratory in Camden, New Jersey, EMSL has built a national network of 25 testing laboratories and one service center, which is located in Charleston, South Carolina.  Customers nationwide can send their specimens to EMSL laboratories for testing.  Although not all of the locations offer the full range of EMSL's services, all of the locations at the very least offer asbestos testing.

**B.  Defendants**

TestAmerica Environmental Microbiology Laboratory, Inc. ("EMLab") provides indoor air quality laboratory services.  Based out of California, EMLab specializes in mold testing and analysis of air and surface samples of fungi, bacteria and other potentially harmful air contaminants. (Bell Affidavit at ¶ 2, Def. Ex. A.)  Since its establishment in 1989, EMLab has expanded rapidly and now has two full service laboratories in San Bruno and San Diego and 20 Micro Labs nationwide. (Bell Affidavit, at ¶ 2.)  In 2003, EMLab merged with TestAmerica, Inc., a national provider of laboratory services for multiple industries, including petroleum testing, hazardous waste and ground water monitoring, pesticide and herbicide testing, and asbestos testing. (Bell Affidavit, at ¶ 3.)  Two years later, in 2005, EMLab itself began providing asbestos-related testing services, which had previously been outsourced. (Bell Affidavit, at ¶¶ 10-11.)  During 2005, EMLab's asbestos-related services accounted for only $25,000 or .25% of its total annual revenue of approximately $10 million.  (Bell Affidavit, at ¶¶ 4, 11.)

**C.  The Marks at Issue**

In conjunction with its services, EMSL has adopted the names and marks "EMSL," "EMSL" and diamond design, "EMSL ANALYTICAL," and related names and marks (collectively

2

"EMSL marks"). EMSL also owns United States Service Mark Registration No. 2,199,503 for the mark "EMSL" in design form. (See EMSL's Registration attached to Compl. as Ex. B.) The United States Patent and Trademark Office ("USPTO") issued the EMSL Registration on October 27, 1998 and the registration achieved incontestable status in 2004. (See Pl. Ex. B.) Although the Defendants do not contest EMSL's ownership of an incontestable registration for such mark, they do point out that the incontestable registration only confers statutory protection to the specific logo shown in the registration itself. (Def. Mem. at 8.)

Plaintiff alleges that Defendants have used and continue to use marks that infringe upon EMSL's marks. Specifically, EMSL identifies the following marks as infringing: (1) EML, (2) Environmental Microbiology Laboratory, Inc., (3) Environmental Microbiology Laboratories, Inc., (4) EMLab, and (5) EMLab Environmental Microbiology Laboratory, Inc. (Pl. Mem. at 6.)

In response, the Defendants argue that the only marks in question are Plaintiff's EMSL mark and Defendants' "EMLab" and "Environmental Microbiology Laboratory, Inc." marks. (See Def. Mem. at 8-10.) Despite Plaintiff's assertions to contrary, Defendants stopped using the EML mark almost five years ago and they have no intention or desire to use it in the future. (Bell Affidavit ¶ 6). Defendants contend that the only arguable commercial use of the EML mark Plaintiff could find is a single section on the "Career Opportunities" page of EMLab's website, which was probably there before the adoption of the EMLab name, and once brought to the attention of Defendants, was immediately corrected. (Bell Affidavit, at ¶7). Also, Defendants assert that the Plaintiff's challenge to Defendants' "Environmental Microbiology Laboratories, Inc." mark is meritless because EMLab's attempt to register that as a mark was a mistake that was corrected in the USPTO by amending the application to seek registration of Defendants' "Environmental Microbiology Laboratory" mark, which is a mark that has allegedly been used by Defendants since early 1989. (See Ex. L attached to Def. Mem.) Therefore, Defendants argue that the only marks

3

at issue are Plaintiff's EMSL marks and Defendants' "EMLab" and "Environmental Microbiology Laboratory" marks.

## II.  STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

The grant of a preliminary injunction is an extraordinary remedy that should only be granted in limited circumstances.  Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d. Cir. 2004) (citing Am. Tel. & Tel. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994) (internal citations omitted)).  Preliminary relief is only warranted where it is necessary to "preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981); see Anderson v. Davila, 125 F.3d 148, 156 (3d Cir. 1997) (noting that the purpose of a preliminary injunction is to maintain the status quo, not decide the issues on their merits).

A district court may grant a motion for a preliminary injunction only if the party seeking the injunction shows (1) likelihood of success on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest. P.C. Yonkers, Inc. v. Celebrations the Party and Seasonal Superstore, LLC, 428 F.3d 504 (3d Cir. 2005) (citing Nutrasweet Co. v. Vit-Mar Enterprises, 176 F.3d 151, 153 (3d Cir.1999) (quoting Maldonado v. Houstoun, 157 F.3d 179, 184 (3d Cir. 1998))).  The party seeking the injunctive relief bears the burden of showing that the extraordinary remedy is necessary. Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994).

## III.  DISCUSSION

### A.  Likelihood of Success on Merits: Trademark Infringement Claim

To prevail in a trademark infringement case under Section 32 of the Lanham Act and New Jersey law, the plaintiff must demonstrate (1) it owns the mark at issue, (2) its mark is valid and legally protectable, and (3) the defendant's use of the mark to identify its goods or services is likely to create confusion concerning the origin of those goods or services. 15 U.S.C. § 1125(a); Commerce

4

Nat'l Ins. Servs. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 437 (3d Cir. 2000); Apollo Distrib. Co. v. Jerry Kurtz Carpet Co., 696 F. Supp. 140, 143 (D.N.J. 1988) (noting that the analysis for trademark and unfair competition claims under New Jersey law is the same as the analysis under federal law).  In analyzing whether the plaintiff has shown a likelihood of prevailing on these elements, the Court must determine that the plaintiff has a "reasonable probability" of success. Moteles v. Univ. of Pa., 730 F.2d 913, 919 (3d Cir. 1984).

### 1.  Ownership and Validity of EMSL's Marks

When a mark has been federally registered and obtains incontestable status under the Lantham Act, it is valid and legally enforceable. Lucent Info. Mgmt., Inc. v. Lucent Tech., Inc., 186 F.3d 211, 215 (3d Cir. 1999); Fisons Horticulture, Inc. v. Vigoro Ind., Inc., 30 F.3d 466, 472 (3d Cir. 1994).  Because it is undisputed that Plaintiff owns an incontestable registration for its EMSL and diamond design mark, Plaintiff has shown the ownership, validity, and legally protectable status of that mark.

Non-registered trademarks are often categorized by degree of distinctiveness.  Those categories include (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992).  Suggestive, arbitrary, or fanciful marks are inherently distinctive and entitled to protection because they do not have an obvious relation to the goods or services to which they refer.  Jews for Jesus v. Brodsky, 993 F. Supp. 282, 298 (D.N.J. 1998).  However, even a non-inherently distinctive mark may acquire distinctiveness if it attains secondary meaning. Id.  A mark obtains secondary meaning when the "primary significance of the terms in the minds of the consuming public is not the product but the producer." Id.

Plaintiff argues that all of its marks (including those that are not registered) bear no logical relationship to the laboratory services that EMSL offers under the marks, making those marks arbitrary and inherently distinctive.  Alternatively, EMSL argues that since 1981 it has made

continuous use of its marks in the sale and advertisement of its goods and services, establishing Plaintiff's ownership and priority of use in the marks.

The Defendant only tangentially addresses these matters as part of its arguments under the "likelihood of confusion" element.

## 2. Likelihood of Confusion

Originally, the Third Circuit held that in trademark infringement cases where the parties deal in competing goods and services, the court need rarely look beyond the mark itself to determine whether there is a likelihood of confusion. Interspace Corp. v. Lapp, Inc., 721 F.2d 460, 462 (3d Cir. 1983).  In those situations, the court would generally "examine the registered mark, determine whether it is inherently distinctive or has acquired sufficient secondary meaning to make it distinctive, and compare it against the challenged mark." Id.

By contrast, where the parties deal in non-competing goods and services, the court would look beyond the mark itself to the nature of the products and the context in which they are sold. Id.  In other words, there would be a greater likelihood of confusion between marks for non-competing goods and services when the non-competing products had similar sales contexts and a close relationship. Id.  In Lapp, the court went on to list ten factors for consideration in non-competing products cases. Id. at 463 (citing Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1229 (3d Cir. 1978)).

However, the Third Circuit later revised the applicability of the Lapp factors by holding that "whether or not the goods compete, the Lapp factors should be employed to test for likelihood of confusion." A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 215 (3d Cir. 2000)  In explaining this holding, the Court noted that "we do not hold that a district court *must* use the factors . . . . If the products are directly competing, and the marks are clearly very similar, a district judge should feel free to consider only the similarity of the marks themselves." Id. at 214.  Furthermore, not all factors will be relevant in every case, and some factors may be weighed

6

more heavily than others depending on the particular factual setting. Id. at 215.  In other words, in the case of *competing* products, the district court may choose to apply whichever Lapp factors it deems relevant to the case at hand. See id.; Freedom Card, Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 471 (3d Cir. 2005). These relevant considerations may include:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
>
> (2) the strength of the owner's mark;
>
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
>
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
>
> (5) the intent of the defendant in adopting the mark;
>
> (6) the evidence of actual confusion;
>
> (7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;
>
> (8) the extent to which the targets of the parties' sales efforts are the same;
>
> (9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;
>
> (10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

A & H Sportswear, Inc., 237 F.3d at 215; see Lapp, 721 F.2d at 463.

Here, the Plaintiff argues that the parties are clearly competitors because they sell the same services, target the same customers, and operate in the same general geographic locations. The Defendants do not dispute that the parties are competitors, though there is not a complete overlap between the services offered by each. Therefore, the Court should look to the similarity of the marks, and then consider other <u>Lapp</u> factors, if necessary or helpful.

In support of its case, the Plaintiff argues that (1) comparison of the marks at issue indicates that the marks are so similar as to generate significant confusion among consumers, and alternatively that (2) the other <u>Lapp</u> factors (strength of the mark, relatedness of the goods and services, length of time mark has been used without actual confusion, intent, instances of actual confusion, channels of trade, and sales efforts) also counsel in favor of a likelihood of confusion.

In response, the Defendants submit that (1) Plaintiff's mark is extremely weak; (2) the respective marks are distinctly different in appearance and pronunciation; (3) the relevant purchasers are sophisticated and likely to exercise great care in making their purchasing decisions; (4) the parties have long co-existed under their marks without significant evidence of actual confusion; and (5) the purported evidence of actual confusion set forth by the Plaintiff is both unreliable and de minimis. (Def. Mem. at 21.) The Defendants also note that even if the <u>Lapp</u> factors relating to similarity of services and trade channels weigh in Plaintiff's favor, those factors are not instructive where the first several <u>Lapp</u> factors allegedly weigh heavily against a finding of likely confusion.

### i.  Similarity of Marks

To evaluate the similarity of marks, the Court must compare the appearance, sound, and meaning of the marks. <u>Palm Bay Imports, Inc. v. Veuve Cliquot Posardin Maison Fondee En 1772</u>, 396 F.3d 1369, 1371 (Fed. Cir. 2005). Although both parties here agree that similarity of marks is the most important <u>Lapp</u> factor, they disagree as to whether the marks here are similar.

(See Pl. Mem. at 23; Def. Mem. at 22;) see also KOS Pharm., 369 F.3d at 712-13 (3d Cir. 2004) ("The single most important factor in determining likelihood of confusion is mark similarity.").

The Plaintiff makes three similarity arguments. First, EMSL states that the Defendants' "EML" mark is "nearly identical" to EMSL's mark. Plaintiff argues that it makes no difference that in some instances EMSL uses a diamond design in conjunction with its EMSL designation because the letters "EMSL" are clearly the dominant portion of the mark. See Country Floors, Inc. v. Partnership Composed of Gepner & Ford, 930 F.2d 1056, 1065 ("When the dominant portions of the two marks are the same, confusion is likely."). Second, EMSL asserts that "EMLab" is confusingly similar to EMSL's mark because it emphasizes "EML" by using caps to set off that portion of the mark from the rest and in some literature, e.g. P.7, the "ab" is faded. Thus, the dominant portion of the "EMLab" mark is "obviously confusingly similar" to EMSL's marks. Third, EMSL argues that the "Environmental Microbiology Laboratory," "EMLab Environmental Microbiology Laboratory," and "Environmental Microbiology Laboratories" are also confusingly similar because they are often abbreviated to the acronym "EML."

The Defendants, in turn, refute these arguments.[2]  First, the Defendants claim that "Environmental Microbiology Laboratory" does not look similar to "EMSL" when written, nor does it sound similar to "E-M-S-L" when spoken. Second, "EMLab" is totally dissimilar from "EMSL" in appearance, and much more so in pronunciation and sound. Therefore, even if the dominant letter portions of the respective marks should be given greater consideration as Plaintiff suggests, the

---

[2]  The Defendants do not address similarity arguments as to "EML," "EMLab Environmental Microbiology Laboratory," or "Environmental Microbiology Laboratories" because Defendants contend that these are not the marks they use for commercial purposes. (See Def. Mem. at 23; Bell Affidavit, at ¶ 7.) The Defendants' argue that because they are not currently using those marks and they are not encouraging customers to use them, the Plaintiff's claims with respect to those particular mark are moot.

Defendants point out that those dominant portions still differ and are pronounced distinctly, "E-M-S-L" v. "M-Lab."  The Defendants cite to several cases, discussed below, which have found that equally or even more subtle differences than those between "EMLab" and "EMSL" are insufficient to establish a likelihood of confusion.  Third, the Defendants note that the incontestable registration for the EMSL mark only protects the EMSL mark in the very specific logo format displayed at footnote 1 of Defendants' brief.  In turn, the Defendants claim that a visual comparison of the respective logos (see Def. Mem. at n.1.) demonstrates the "futility" of Plaintiff's argument that the visual similarity of the respective marks is "obvious and irrefutable."

    The case law on the similarity of the marks cuts both ways in like circumstances. See B.V.D. Licensing Corp. v. Body Action Design, 846 F.2d 727, 729 (Fed. Cir. 1988) (no likelihood of confusion between BVD and BAD because BVD was so popularly recognized that the observer would be more likely to notice immediately that BAD is a different symbol);  NEC Electronics, Inc. v. New England Circuit Sales, Inc., 722 F. Supp. 861, 864 (D. Mass. 1989) (no likelihood of confusion between NEC and NECS marks, despite the similarity of letters, because NECS often uses a logo and otherwise prominently identifies the full name of its company along with the "NECS" acronym); Basic Am. Medical, Inc. v. Am. Medical Int'l, Inc., 649 F. Supp. 885, 893 (S.D. Ind. 1986) (no likelihood of confusion between AMI and BAMI because patients know the difference between different hospitals, the two companies were traded on different exchanges, the number of letters in each symbol was different, and the pronunciation of the common letters was not the same); Johnson & Johnson v. Colgate-Palmolive Co., 345 F. Supp. 1216, 1222 (D.N.J. 1972) (the marks "Shower to Shower" and "Hour After Hour" as applied to their respective products were not confusingly similar, nor was there a practical likelihood that a potential shopper would be confused or deceived by any similarities as to the parties' respective products); Lebow Bros., Inc. v. Lebole Euroconf S.p.A., 503 F. Supp. 209, 211 (E.D. Pa. 1980) (no likelihood of confusion between

"Lebow" and "Lebole" based on sight or sound because there were differences in the spelling and number of letters in the marks, the number of words appearing in the marks and on the labels was different, and the overall general appearance of the marks was sufficient to dispel any threat of confusion). But see Edison Brothers Stores, Inc. v. Brutting E.B. Sport-Int'l Gmbh, 230 U.S.P.Q. 530, *532 (T.T.A.B. 1986) ("EB" within diamond shaped logo is confusingly similar to "EBS" where both were arbitrary marks for identical products, and they only differed by one letter and the diamond shaped design); Crystal Corp. v. Manhattan Chem. Mfg. Co., 75 F.2d 506, 508 (C.C.P.A. 1935) ("Z.B.T." was confusingly similar to "T.Z.L.B." where the lettered marks were for goods with the same descriptive properties).  Based on these precedents, it appears that the determination as to the degree of similarity between two marks is highly fact sensitive and there is no decisive rule that is dispositive of any particular case.

Here, the Plaintiff's strongest argument regarding the degree of similarity pertains to Defendants' "EML" marks.  However, the Defendant has presented evidence that it stopped using that mark years ago and currently does not use it commercially or encourage its customers to do so either.  Therefore, even if EMSL and EML are similar in sight and sound, there is no reason for an injunction to stop behavior that is not actually occurring.[3]

---

[3]  Plaintiff continues to allege that the Defendants are still using "EML" as a mark.  In support of this assertion, the Plaintiff cites to an excerpt from David Bell's deposition transcript wherein he admits that the term "EML" is probably easier to remember than "EMLab." (See Pl. Supp. Mem. at 14; Bell Dep. at 127-28, Pl. Supp. Ex. A.)  In addition, the Plaintiff cites to a Declaration by David Bell which was executed in January 2004 and used in state court litigation.  In that Declaration, Bell refers to the term "EML" many times. (See Declaration, Pl. Supp. Ex. G.)  The Plaintiff also cites references to "EML" in the Defendants' employee data system for reporting various "bugs" or problems. (See Bug-logs, Pl. Supp. Ex. H.)  Plaintiff also relies upon an April 1, 2005 letter from an accrediting agency which repeatedly refers to the Defendant as "EML." "EML" also appeared in one page of the EMLab website, and it appears at the bottom right of some chain of custody forms.  (See Letter, Pl. Supp. Ex. I.)  Although all of these documents show that some internal employees and outside agencies may still refer to the Defendants as "EML," they do not show that the Defendants are still continuing to use or market the "EML" mark in a commercial manner.

11

With respect to Defendants' "EMLab" mark, although it may be a close call, the degree of similarity actually tips slightly in favor of the Defendants. From a visual perspective, three of the dominant letters "EML" also appear in EMSL's mark. However, there are a different total number of letters and the pronunciation/sound of the marks is remarkably different (M-Lab v. E-M-S-L). In addition, EMSL's registered trademark is only for the EMSL and diamond design, which looks nothing like EMLab's logo. Similarly, Defendants' "Environmental Laboratory Inc." mark neither looks nor sounds anything like "EMSL" or "EMSL Analytical," and the Defendants have submitted evidence, despite Plaintiff's assertion to the contrary, that they do not use the term "EML" as an acronym for "Environmental Laboratory, Inc." Therefore, it appears that the degree of similarity in and of itself is not a sufficient basis for Plaintiff to rely upon to establish a likelihood of confusion in this matter.

### ii.  Strength of the Mark and Sales Efforts

The parties also dispute the strength of Plaintiff's marks. On one hand, Plaintiff argues that EMSL's marks are arbitrary, and therefore, are inherently distinctive and strong. Additionally, EMSL argues that its extensive use of the EMSL marks since 1981 establishes that the EMSL marks have acquired secondary meaning in the marketplace and are distinctive of EMSL's goods and services. On the other hand, Defendants argue that Plaintiff's marks are weak because (1) they are not arbitrary or fanciful marks; (2) there is a great deal of third party use of Plaintiff's marks or portions thereof; and (3) there is no evidence that the money Plaintiff spent on advertising/marketing those marks led to consumer recognition.

The height of these arguments reveals that Defendants have a better argument regarding the relative strength of Plaintiff's marks. First, it is unclear whether or not Plaintiff's "EMSL" marks are arbitrary or not. The Plaintiff admits that, when the company began, EMSL stood for "Electron Microscopy Service Laboratory, Inc." The Defendants argue that this acronym describes Plaintiff's

12

business, and therefore, it is not an arbitrary or fanciful designation.  In response, the Plaintiff's argue that although "EMSL" was originally an acronym for its former trade name, that is no longer the case.

Second, the $5.5 million dollars that Plaintiff has spent in the last three years on advertising and marketing its goods and services is not necessarily indicative of the strength of Plaintiff's marks. The Plaintiff has admitted that this $5.5 million figure was largely comprised of the salaries of 24 sales persons.  Moreover, there has been no showing that those expenditures created actual consumer recognition of Plaintiff's marks.  Without such proofs, the dollar amount of Plaintiff's advertising expenditures is not necessarily probative of the strength of its marks.  See Worthington Foods, Inc. v. Kellogg Co., 732 F. Supp. 1417, 1435 (S.D. Ohio 1990).

Third, the Defendant sets forth significant evidence that third parties have used marks that are very similar or identical to Plaintiff's marks.  Other environmental testing companies use the following marks: EMS Laboratories, Inc. (EMSLabs); SE Environmental Microbiology Laboratory, Inc.; Environmental Monitoring Systems, Inc. (EMS); EM Analytical, Inc.; Environmental Diagnostics Laboratory (EDL); Environmental and Analytical Management (EAM); EMAX Laboratory; and Environmental Molecular Sciences Laboratory (EMSL).  Given this seemingly vast third party usage of portions of Plaintiff's marks, it does not appear that Plaintiff's non-registered marks are particularly strong. See Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C., 212 F.3d 157, 176 (3d Cir. 2000) (in trademark dilution case the court noted that "the degree of a mark's distinctiveness is weakened by third party use of the mark and by the descriptive nature of the mark"); General Mills, Inc. v. Kellogg Co., 824 F.2d 622, 627 (8th Cir. 1997) ("evidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak"); Estee Lauder Inc. v. The Gap, Inc., 108 F.3d 1503, 1511 (2d Cir. 1997) (although trademark was inherently distinctive, extensive third-party use of the term for various products

13

weakened the strength of the mark).; Commerce Bancorp Inc. v. BankAtlantic, 285 F. Supp. 2d 475, 493 (D.N.J. 2003) (other instances of third-party usage of mark or part of mark show that there is no national recognition of the Plaintiff's mark, and thus, the mark is not strong); Quality Semiconductor, Inc. v. Qlogic Corp., 31 U.S.P.Q.2d 1627, 1629 (N.D. Cal. 1994) ("an arbitrary mark may be classified as weak where there has been extensive third party use of similar marks on similar goods").

Simply put, Plaintiff's marks do not seem particularly strong given the remaining questions regarding the "arbitrariness" and consumer recognition of Plaintiff's marks, as well as the seemingly substantial third party usage of portions of Plaintiff's marks.

### iii.  Sophistication of Customers

Where the parties' customers are sophisticated and the purchase process requires close analysis by the buyer, confusion is often unlikely.  See Sara Lee Corp. v. Kayser-Roth Corp., 81 F.2d 455, 467 (4th Cir. 1996) ("In a market with extremely sophisticated buyers, the likelihood of consumer confusion cannot be presumed on the basis of similarity"); Video Pipeline, Inc. v. Buena Vista Home Entertainment, 275 F. Supp. 2d 543, 571 (D.N.J. 2003) ("confusion is unlikely if the products or services at issue are complex and expensive, the purchasers highly sophisticated, and the purchase process one that is lengthy and requires close attention and analysis by the purchasers"). Despite Plaintiff's urging to the contrary, here, the customers are sophisticated commercial entities including industrial hygenists, IAQ consultants, environmental specialists, etc.  Moreover, the Plaintiff acknowledges there is a price differential between the parties' services and that the sale of the services requires direct and repeated personal contact with customers.  Def. Ex. N at 9; see also Accuride Intl., Inc. v. Accuride Corp., 871 F.2d 1531, 1537 (9th Cir. 1989) (direct sales by knowledgeable salespersons weighs heavily against finding a likelihood of confusion); Pignons S.A. de Mechanique v. Polaroid Corp., 498 F. Supp. 805, 811 n. 8 (D. Mass. 1980) (noting that price

14

differential may be relevant to determining confusion). Thus, the sophisticated nature of the customers and the involved sales process militate against finding a likelihood of confusion.

### iv.  Long Coexistence without Instances of Confusion

There also appears to have been a long period of time where the parties co-existed without any alleged instances of actual confusion.  The Defendants have been in existence as "Environmental Microbiology Laboratory" since 1989.  There was no allegation of confusion until Plaintiff initiated this suit on November 4, 2005.  Therefore, nearly 14 years passed without any documented instances of actual confusion regarding the "Environmental Microbiology Laboratory" mark.  Similarly, Defendants started using the EMLab mark in late 2001, yet the first documented instance of actual confusion is from January 2003 and was not sued upon until November 2005.  Therefore, at the very least, more than a year passed without any confusion as to the EMLab mark.  The Plaintiff does not really argue anything persuasive on this point other than to say that the Defendants have used the "Environmental Microbiology Laboratory" mark since 1981 and that "the number of known instances of confusion go as far back as 2003." (See Pl. Mem. at 26.)  Consequently, the seemingly long duration of time wherein the parties co-existed without any alleged instances of confusion weighs against a finding of likely confusion.

### v.  Channels of Trade and Relatedness of Goods and Services

The parties seem to agree that they provide very similar goods and services, and they both use the same channels of trade, including web resources and industry trade journals and publications. Therefore, the channels of trade and relatedness of goods and services factors weigh in favor of Plaintiff.

vi.  Evidence of Actual Confusion

Plaintiff's papers  identify between 15 and 20 instances of actual customer confusion. (See Pl. Mem. at 8-12; Pl. Supp. Mem. at 11-13; Frasca Aff. at Pl. Ex. E; Frasca Supp. Aff. at Pl. Supp. Ex. C; Carillo Aff. at Pl. Supp. Ex. D; Rumaker Aff. at Pl. Ex. 6.)  At trial Plaintiff introduced testimony from Paul Viemann, Joseph Frasca, Luc Boisclair and Robert DeMalo, to help buttress their allegations.  These instances of actual confusion include, among other things, (1) instances where samples were mistakenly sent to the wrong laboratory; (2) instances where emails were mis-sent to the wrong company or email address; (3) instances where consumers confused the parties' laboratory locations; (4) instances where publications have been erroneously attributed to one party rather than the other; and (5) instances where customers have sent checks to the wrong company. In response, the Defendants argue (1) most of Plaintiff's examples of actual confusion are based upon hearsay that is uncorroborated and unreliable; and (2) even if those examples are credible, the number of alleged instances of actual confusion is de minimis.

Although it is true that nearly all of Plaintiff's examples of actual confusion are based upon hearsay, and even multiple levels of hearsay, as the court ruled based on Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700 (3d Cir. 2004), that does not make them inadmissible on a motion for preliminary injunction.  But that does not end the inquiry, for the court must determine the weight of this evidence.  Zeller. Plastik, Koehn, Grabner & Co. v. Joyce Molding Corp., 698 F.Supp. 1204, 1277 (D.N.J. 1988) (uncorroborated hearsay not persuasive or weighty).

Moreover, in general, "actual confusion evidence collected by employees of a party in a trademark action must be viewed with skepticism because it tends to be biased or self-serving." Citizens Fin. Group, Inc. v. Citizens Nat. Bank of Evans City, 383 F.3d 110, 122 (3d Cir. 2004)

(citations omitted).  Here, all of the evidence of actual confusion was reported by EMSL employees and presented in affidavits and testimony by EMSL employees.  In addition, the impact of instances of alleged confusion is undermined when a party has been actively searching for instances of confusion and finds only a few.  See Sun Banks of Florida, Inc. v. Sun Federal Sav. & Loan, 651 F.2d 311, 319 (5th Cir. 1981) (finding impact of number of instances of actual confusion is minimized where Sun Banks' president sent a letter to all subsidiary banks requesting employees to report incidents of confusion stemming from defendant's use of the word "Sun").  In this case, Mr. Frasca issued an "edict" to EMSL's employees in April 2004 directing them to look for and document alleged instances of confusion between Plaintiff's EMSL marks and Defendants' marks.

Finally, the Defendants point out that regardless of the hearsay problems with Plaintiff's proofs, EMSL still only identifies a de minimis number of instances of actual confusion.  In situations where there are only a few instances of actual confusion presented, such evidence may be de minimis in light of the length of time the parties operated together without significant evidence of confusion.  See Checkpoint Systems, Inc. v. Check Point Software, 269 F.3d 270, 298-99 (3d Cir. 2001); Barre-National, Inc. v. Barr Labs, Inc., 773 F. Supp. 735, 744 (D.N.J. 1991) ("Use of similar marks for a substantial period of time with no confusion among consumers may create a presumption that there is little likelihood of confusion.").  Moreover, when a Plaintiff receives a substantial number of customer inquiries and other communications, isolated instances of confusion weigh against a finding of likely confusion.  A&H Sportswear, 237 F.3d at 227 (isolated instances of confusion insufficient to support finding of likely confusion); Scott Paper Co., 589 F.2d at 1231 (nineteen misdirected letters over four years weighed against finding of confusion); Nippondenso Co. v. Denso Distrib., No. 86-3982, 1987 WL 10703, at * 5 (E.D. Pa. May 11, 1987) ("If isolated instances of actual confusion result from the sale of a substantial number of goods, the weight given to the evidence of actual confusion is markedly reduced.").  Here, the Plaintiff presents less than

20 instances of alleged confusion since January 2003.  Given that EMSL works on approximately 233,000 projects each year, let alone the number of customer inquiries that both parties receive annually, 15-20 instances of confusion does seem de minimis.

Overall, the factors relating to the Plaintiff's likelihood of success on the merits weigh against granting the injunction.  Although there are some similarities between the parties' marks and there are alleged instances of actual confusion, the strength of the mark, the length of time the parties coexisted without instances of confusion, and the sophistication of the parties' customers all heavily weigh against finding the likelihood of confusion necessary to prevail on a trademark infringement claim.

### B.  Likelihood of Success on Merits: State Law Dilution Claim

In the context of trademark dilution, New Jersey law provides that :

> the owner of a mark which is famous in the State shall be entitled, subject to the principles of equity, to an injunction, commencing after the owner's mark becomes famous, against another person's use of the mark which causes dilution of the distinctive quality of the owner's mark, and to obtain other relief provided in this section.

N.J. Stat. Ann. § 56:3-13.20.  To determine whether a mark is famous, a court may consider (1) the degree of inherent or acquired distinctiveness of the mark in New Jersey; (2) the duration and extent of use of the mark in connection with the goods and services provided; (3) the duration and extent of advertising and publicity of the mark in New Jersey; (4) the geographical extent of the trading area in which the mark is used; (5) the channels of trade for the goods or services with which the registrant's mark is used; (6) the degree of recognition of the registrant's mark in trading areas and channels of trade in New Jersey; and (7) the nature and extent of use of the same or similar mark by third parties. Id.

18

In addition to the "famous" requirement, a plaintiff in a trademark dilution case under either federal or New Jersey law must establish (1) a sufficient similarity between the junior and senior marks to evoke an "instinctive mental association" of the two by a relevant universe of consumers, which (2) is the effective cause of (3) an actual lessening of the senior mark's selling power, expressed as "its capacity to identify and distinguish goods or services." Deborah Heart & Lung Ctr. v. Children of the World Found., Ltd., 99 F. Supp. 2d 481, 492 (D.N.J. 2000) (quoting Am. Cyanamid Co. v. Nutraceutical Corp., 54 F. Supp. 2d 379, 391 (D.N.J. 1999) (internal citation omitted)).

Here, the Plaintiff makes several arguments in support of its claim of holding "famous" marks. First, Plaintiff notes that its EMSL and diamond design mark is registered with the USPTO. Second, Plaintiff claims that all of its marks have been in continuous use since 1981 and have acquired distinctiveness in New Jersey and across the country. Third, EMSL has its headquarters in New Jersey and has engaged in significant advertising in publications and trade shows within the state and on the national level. Fourth, Plaintiff claims to have spent $5,500,000 on marketing its goods and services nationwide, and further, that its name and services are known in New Jersey and nationwide. Without citing to any record evidence to support these claims, the Plaintiff then concludes that its marks are famous.

The Plaintiff then goes on to assert that the similarity of the parties' marks has caused dilution of Plaintiff's marks. However, the Plaintiff only makes bald assertions like "the similarity of the marks is clearly evident" and "Defendants' use of these confusingly similar marks is the direct and proximate cause of a blurring and lessening of the distinctive quality of EMSL's marks, as well as EMSL's selling power, goodwill and reputation within the trade and amongst customers and consumers." (Pl. Mem. at 36-36.) Nowhere in this discussion does the Plaintiff present any evidence of these assertions. Moreover, courts have rejected dilution claims involving marks that are not

19

essentially the same.  See Luigino's, Inc. v. Stouffer Corp., 170 F.3d 827, 832 (8th Cir. 1999) ("Lean 'N Tasty" mark did not dilute "Lean Cuisine" mark); Mead Data Central, Inc. v. Toyota Motor Sales USA, Inc., 875 F. 2d 1026, 1028-29 (2d Cir. 1989) ("LEXIS" and "LEXUS" not substantially similar for dilution purposes); Am. Cyanamid, 54 F. Supp. 2d at 392-93 (differently designed rainbows not sufficiently similar for dilution purposes). Therefore, Plaintiff has not actually established that its marks are famous and/or that the similarity of the parties' marks effectively caused the dilution of EMSL's marks.

Not only that, but Plaintiff apparently forgets to argue a necessary element to establish trademark dilution.  That is, Plaintiff does not include any evidence of an "instinctive mental association" between its mark and Defendants' marks. Generally, this element is established through survey evidence of consumer recognition.  See Times Mirror Magazines, 212 F.3d at 175 (even though commentators dispute the percentage of surveyed consumers necessary to prove consumer recognition, the Court "took issue" with the fact that Times Mirror was granted a preliminary injunction without "offering any evidence whatsoever of consumer recognition"); Pharmacia Corp., 201 F. Supp. 2d at 380 (citing Xuan-Thao N. Nguyen, The New Wild West: Measuring and Proving Fame and Dilution Under the Federal Trademark Dilution Act, 63 Albany L. Rev. 201, 237 (1999)) ("To establish proof of dilution . . . evidence must meet a minimum threshold of at least 20% of respondents making a mental association between the famous mark and junior mark."). Here, where the Plaintiff has not presented any evidence, let alone survey evidence, to support the "instinctive mental association" requirement for a trademark dilution claim, such claim is not likely to succeed on the merits.

**C.  Irreparable Harm to Plaintiff**

After considering the likelihood of success on the merits, the Court must consider whether the denial of preliminary injunctive relief would cause the Plaintiff to suffer irreparable injury.

Irreparable injuries include loss of control of reputation, loss of trade, and loss of goodwill. Opticians Ass'n of America v. Independent Opticians of Am., 920 F.2d 187, 195 (3d Cir. 1990).  In addition, once a likelihood of confusion has been established in a trademark infringement case, the inescapable conclusion is that there was also irreparable injury.  Pappan Enter., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998) (citations omitted).

In EMSL's original motion papers, it argued that "because Plaintiff has demonstrated a likelihood of confusion in this case, it follows that it has demonstrated irreparable injury." (Pl. Mem. at 37.) Although it is true that a likelihood of confusion creates an irreparable injury, here, the Plaintiff has not demonstrated a likelihood of confusion.  Therefore, that argument is unpersuasive.

In addition EMSL argues that it has suffered and will continue to suffer "significant loss of business as a result of Defendants' trademark infringement, unfair competition and trademark dilution."  EMSL also claims that it has suffered and will continue to suffer "significant damages to its marks, reputation and goodwill, the extent of which is impossible to quantify." (See Pl. Mem. at 37-38.)  However, EMSL makes no effort to present any evidence to back up these assertions of loss. By contrast, the Defendants submit evidence that two high-level employees of EMSL deposed that they could not think of any immediate irreparable harm that would come to EMSL if the preliminary injunction did not issue.  (See Frasca Dep. at 532, Def. Ex. D; DeMalo Dep. II at 82, Def. Ex. M.) In addition, EMSL has admitted that since it began building its case for trademark infringement against EMLab, its annual revenue has increased significantly and is expected to continue to do so in the coming year despite the alleged infringement. (See DeMalo Dep. I at 148, Def. Ex. B; Frasca Dep. at 152-153, Def. Ex. D.)  Not only that, but DeMalo testified that EMSL's revenue, consumer totals, and sample testing numbers have each increased every year since

2003.  Finally, EMSL admitted that no mistaken purchasing decisions were ever made as a result of any alleged confusion between the marks.  (See PL. Answers to Interrog. No. 7, Def. Ex. K.)

This evidence suggests that EMSL has not suffered any irreparable harm.  Alternatively,

Defendants argue that there can be no irreparable harm because Plaintiff delayed three years in filing

for a preliminary injunction.  Where a Plaintiff delays in seeking preliminary injunctive relief, such

delay is evidence that speedy relief is not needed.  See New Dana Perfumes Corp. v. The Disney

Store, Inc., 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) (unexplained delay of two months in filing

cease and desist letter followed by unexplained delay of five months in moving for injunctive relief

precluded a finding of irreparable harm); Gidatex, S.r.L. v. Campaniello Imports, Ltd., 13 F. Supp.

2d 417, 419 (S.D.N.Y. 1998) (noting that in the trademark infringement context "courts typically

decline to grant preliminary injunctions in the face of unexplained delays of more than two months");

Orson, Inc. v. Miramax Film Corp., 836 F. Supp. 309, 312 (E.D. Pa. 1993) (delay of 50 days after

plaintiff acquired knowledge of infringement precluded finding of irreparable harm).  The delay

period begins to run once the Plaintiff has actual or constructive knowledge of the Defendant's use

of allegedly infringing marks. See Pharmacia, 201 F. Supp. 2d at 383 (citations omitted) (where

plaintiff delayed seeking injunction after having actual or constructive knowledge

of infringement, court found that the delay "knocks the bottom out of any claim" for preliminary

injunctive relief); Warner Lambert Co. v. McCrory's Corp., 718 F. Supp. 389, 395 (D.N.J. 1989)

(applying constructive knowledge standard to find that seven month delay significantly weakens

plaintiff's attempt to show irreparable harm).

     In the present case, the Plaintiff's Supplemental papers claim that EMSL did not realize the

extent and nature of the alleged infringement until Defendants announced their accreditation to

perform asbestos services in June 2005. (Pl. Supp. Mem. at 25.)  However, the Defendants submit

significant evidence that shows Plaintiff had knowledge of the alleged infringement well before June

2005.  First, Plaintiff admits that it had actual knowledge of "EML" and "Environmental

Microbiology Laboratory, Inc.," and the services they offered in 1999, more than six years prior to

seeking injunctive relief. (See Interrog. Answers No. 2, Def. Ex. K.) Second, Plaintiff admitted that it was aware of "EMLab" and "EMLab Environmental Microbiology Laboratory, Inc" marks for at least 3-4 years before filing its motion for a preliminary injunction. Id. Third, Mr. Frasca deposed that he was aware of Defendants in 2000 when he received information about them at a trade show, and then went on Defendants' website to learn more. (See Frasca Dep. at 75, Def. Ex. D.) Fourth, Mr. DeMalo (EMSL's Vice President of Laboratory Services) admitted that EMSL was contemplating a trademark infringement action against EMLab even before EMLab initiated the so-called Boggs Litigation against EMSL in January 2004. (See DeMalo Dep. I at 50-51, Def. Ex. B.) Fifth, EMSL demanded that the settlement agreement in the Boggs Litigation in October 2004 include a "carve out" which allowed EMSL to sue EMLab for trademark infringement in the future. (See Def. Ex. I at ¶¶ II(c) and IV(3)(B).) Sixth, Mr. Frasca issued an email edict on January 18, 2005 to EMSL's entire sales and marketing team, the customer service department, and its collections personnel directing them to be on the lookout for instances of confusion between EMSL and EMLab. (See Pl. Ex. P to Frasca Aff.) At trial, Plaintiff's witnesses attempted to avoid some of these discovery responses. Frankly, that testimony was not credible. Therefore, the weight of the evidence shows that Plaintiff did have knowledge of the alleged infringement well before June 2005, but even if it didn't, the six month delay in failing to seek injunctive relief until December 2005 would be sufficient to preclude a finding of irreparable harm. See New Dana Perfumes, 131 F. Supp. 2d at 630 (unexplained delay of two months in filing cease and desist letter followed by unexplained delay of five months in moving for injunctive relief precluded a finding of irreparable harm); Gidatex, 13 F. Supp. 2d at 419 (4 ½ months delay is too long); Orson, 836 F. Supp. at 312 (delay of 50 days after plaintiff acquired knowledge of infringement precluded finding of irreparable harm).

In an effort to justify the delay, Plaintiff argues that the delay was caused by Plaintiff's efforts to investigate the infringement and pursue alternative remedies. See Kos Pharm., Inc. v. Andrx

Corp., 369 F.3d 700, 727-28 (3d Cir. 2004) (finding that 13 month delay before filing complaint was not unreasonable where plaintiff had pursued administrative remedies with the

USPTO prior to filing the complaint and defendants' conduct had suggested that the matter may be resolved without litigation).  Specifically, Plaintiff argues that its attorneys first acted to enforce EMSL's marks by filing a Notice of Opposition to Defendants' trademark filing with the Trademark Trial and Appeal Board of the USPTO in October 2005. (See Pl. Ex. 4.)  In addition, after the Complaint was filed, EMSL allegedly engaged in discussions with Defendants seeking alternatives to pursuing the litigation. (See DeMalo Supp. Aff. at ¶ 12.)  Although these arguments might preclude a finding of unreasonable delay if EMSL first acquired knowledge of the alleged infringement in June 2005 as Plaintiff contends, these alternative remedy arguments would not explain why EMSL waited two to three years to initiate any kind of proceeding.  In other words, the pivotal inquiry appears to be when did EMSL first know or when should it have known about the alleged infringement. The evidence shows it was at the very least during the Boggs litigation.

### E.  Irreparable Harm to Defendant

The Plaintiff argues that there would be no irreparable harm to Defendants if the injunction was granted and Defendants were forced to change their name.  Plaintiff argues that such harm would be "self-inflicted" because Defendants knew of EMSL's marks, services, and locations, but still chose to unfairly compete with EMSL and infringe its marks.  (Pl. Mem. at 38-39.) Alternatively, Plaintiff argues that the harm imposed by requiring Defendants to change their name would not be irreparable and could be compensated by monetary damages.  The Plaintiff also suggests that because Defendants have talked about changing their name, there would be no harm in forcing them to do it now, rather than later.

In response, the Defendants point out that if the Court grants the preliminary injunction, the Defendants will not only suffer monetarily, but they will also irreparably lose their name and the

goodwill behind that name that they have been building since 1989 (2001 in the case of "EMLab"). An injunction would be a particularly extraordinary remedy given that EMSL has not presented a compelling case of infringement or unfair competition.  In addition, by EMSL's own admission, a preliminary injunction is not necessary in this case to maintain the status quo. (See DeMalo Dep. II at 82-83, Def. Ex. M.)

Because the Plaintiff has not clearly established a likelihood of success on its claims, nor presented evidence of any irreparable harm that will befall it if the injunction does not issue, the balance of equities here counsels against granting the injunction.

**F.  Public Interest**

The Plaintiff argues that the right of the public not to be deceived or confused suggests that the Court should grant the injunction. See Specialty Measurements, Inc. v. Measurement Sys., Inc., 763 F. Supp. 91, 96 (D.N.J. 1991) (recognizing a public interest in the protection of a trademark and in protecting the public from confusion).  However, because the Plaintiff does not present a compelling case demonstrating a likelihood of confusion between the parties' marks, the only interest that would be served by granting the injunction would be EMSL's interest in injuring a competitor. Defendants' argue that, in these circumstances, granting the relief sought would actually harm the public interest in promoting vigorous competition. RPF Holding Corp. v. Bedrooms Plus, 1988 WL 145361, at *6  (D.N.J. 1988) (recognizing public interest in free competition).  In any event, the public interest does not weigh in Plaintiff's favor where the Plaintiff has not presented evidence that would likely prove that Defendants infringed their marks.

**IV. CONCLUSION**

Based upon the foregoing, Plaintiff does not present a compelling case for preliminary injunctive relief, and the Motion for a Preliminary Injunction is **denied**.


s/Robert B. Kugler
ROBERT B. KUGLER
United States District Judge


Dated:  April 4, 2006